**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ERIK RAMOS-LOPEZ,

*Petitioner,*

v.

ERIC H. HOLDER, JR.,* Attorney General,

*Respondent.*

No. 06-72402

Agency No.
A098-919-259

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Submitted April 11, 2008**
Seattle, Washington
Submission Vacated and Deferred April 28, 2008
Resubmitted March 5, 2009

Filed April 16, 2009

Before: A. Wallace Tashima, M. Margaret McKeown, and
William A. Fletcher, Circuit Judges.

Opinion by Judge Tashima

---

*Eric H. Holder, Jr., is substituted for his predecessor Michael B. Mukasey, as Attorney General, pursuant to Fed. R. App. P. 43(c)(2).

**The panel unanimously finds this case suitable for decision without oral argument. *See* Fed. R. App. P. 34(a)(2)(C).

## COUNSEL

Juliann Bildhauer, Seattle, Washington, for the petitioner.

Susan M. Harrison, Assistant United States Attorney, Seattle, Washington, for the respondent.

## OPINION

TASHIMA, Circuit Judge:

Petitioner Erik Ramos-Lopez ("Ramos"), a Honduran national, petitions for review of a Board of Immigration Appeals' ("BIA") order denying asylum and withholding of removal. An Immigration Judge ("IJ") credited as true Ramos' testimony that he refused recruitment into the Mara Salvatrucha ("MS-13"), a Central American gang, and that MS-13 members subsequently threatened to kill him. The dispositive issue in this case is whether Ramos suffered or has a well-founded fear of persecution on account of a particular social group — young Honduran men who have been recruited by the MS-13, but who refuse to join — or political opinion. The BIA recently determined that young Salvadoran men who have resisted recruitment into the MS-13 do not constitute a particular social group and that the refusal to join the MS-13 does not amount to a political opinion. *In re S-E-*

*G-*, 24 I. & N. Dec. 579, 583, 589 (BIA 2008). Applying the principles of deference established in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), we defer to the BIA's decision with respect to social group and deny the petition.

## I.

Ramos was born and raised in Puerto Cortes, Honduras. Ramos' problems with the MS-13 began in January 2004, when he was sixteen years old. During his first encounter with the MS-13, a gang member approached him and a friend outside of Ramos' home. The MS-13 member told them that "it was time to join," took out a gun, and told the boys to come with him to rob some people. When Ramos and his friend did not respond or move, the man warned them that if they "wanted to live, he would be waiting." Later that year, another MS-13 member returned to Ramos and his friend and again delivered the message that "it was time to join." The gang member showed the boys his gun and told them that they could either join the MS-13 or be killed.

In January 2005, Ramos fled to Mexico. He was detained by Mexican authorities and returned to Honduras the same month. After Ramos returned to Puerto Cortes, MS-13 members threatened to kill him or a member of his family if he tried to escape from Honduras again. He avoided further encounters with the MS-13 before fleeing Honduras in May 2005.

Ramos entered the United States on May 16, 2005. On May 17, 2005, he was detained by Border Patrol agents and served with a Notice to Appear, charging him with removability for being an alien present in the United States without being admitted or paroled. Ramos conceded removability and applied for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT").[1] During his

---

[1]Ramos included the following with his asylum application: a personal declaration, an affidavit from a journalist living in Honduras, a letter writ-

removal hearing, Ramos testified about his three encounters with MS-13 members in Puerto Cortes.

In response to questioning by the IJ, Ramos also testified that he did not join the MS-13 because he would have lost contact with his family, would have been obligated to steal, and "probably spend most of [his] life in jail." Of the group of Ramos' friends who were recruited by the MS-13, two joined the gang, one or two were killed, others were hiding in Honduras, and some fled to the United States. Ramos was afraid that MS-13 members would kill him, but he never went to the police for help. Two of Ramos' brothers, ages nineteen and twenty, remained in Puerto Cortes. The MS-13 did not bother the nineteen-year old, but started looking for the twenty-year old after Ramos fled. Ramos' twelve-year old brother lives with his parents, but has not had problems with the gang because he is too young. A sixteen-year old sister also lives with Ramos' parents.

The IJ found Ramos credible, but, even after crediting his testimony as true, denied asylum, withholding of removal, and protection under the CAT. The IJ held that Ramos could not establish eligibility for asylum or withholding because he did not face persecution on account of his membership in a cognizable social group or any political opinion. Alternatively, the IJ held that Ramos did not suffer past persecution or have a well-founded fear of future persecution.[2] The IJ further denied CAT relief because Ramos did not face a clear probably of torture in Honduras.

---

ten by a friend in Honduras, and over one hundred pages of supporting documents describing gang activity in Honduras and Central America.

[2] In support of his decision, the IJ found that the MS-13 members never physically harmed Ramos or members of his family, Ramos' family continued to live in Honduras without incident, and the police were not unwilling or unable to protect Ramos from the MS-13.

The BIA affirmed in a summary disposition. Ramos timely petitions for review of the denial of asylum and withholding of removal, but not the denial of CAT relief.

## II.

We have jurisdiction pursuant to 8 U.S.C. § 1252(a). When, as here, the BIA summarily affirms the IJ's decision, we review the IJ's decision as the final agency action. 8 C.F.R. § 1003.1(e)(4)(ii); *Zehatye v. Gonzales*, 453 F.3d 1182, 1184 (9th Cir. 2006) (citing *Kebede v. Ashcroft*, 366 F.3d 808, 809 (9th Cir. 2004)). We review the IJ's legal determinations de novo. *See Halaim v. INS*, 358 F.3d 1128, 1131 (9th Cir. 2004).

The IJ's findings of fact "are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). Thus, we review the IJ's findings of fact for substantial evidence. *Halaim*, 358 F.3d at 1131. Additionally, "[w]e accept [the petitioner's] testimony as true when, as here, the IJ found [him] to be credible." *Id.* (citing *Salazar-Paucar v. INS*, 281 F.3d 1069, 1073 (9th Cir.), *amended by* 290 F.3d 964 (9th Cir. 2002)).

## III.

[1] Congress vested the Attorney General with the discretion to grant asylum to refugees. 8 U.S.C. § 1158(b)(1)(A). The INA defines "refugee," in relevant part, as:

> any person who is outside any country of such person's nationality . . . and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. § 1101(a)(42)(A). While asylum is a discretionary form of relief, the Attorney General must grant withholding of removal if "the alien's life or freedom would be threatened" in the country to which he would be removed because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). Thus, to be eligible for either form of relief, the persecution feared must be on account of one of the five protected grounds. *Hanna v. Keisler*, 506 F.3d 933, 937 (9th Cir. 2007) (asylum); *Nadarajah v. Gonzales*, 443 F.3d 1069, 1081-82 (9th Cir. 2006) (withholding of removal).

## A. Particular Social Group

**[2]** Ramos' claims for asylum and withholding of removal are predicated, primarily, on his membership in a particular social group: young Honduran men who have been recruited by the MS-13, but who refuse to join. Recently, the BIA issued a precedential opinion in which it held that Salvadoran youth who have resisted gang recruitment are not a cognizable social group under the INA. *In re S-E-G-*, 24 I. & N. Dec. at 588.

**[3]** We have not yet had the occasion to address whether the BIA's determination, in a published disposition, that a group is or is not a "particular social group" is entitled to *Chevron* deference. After *Marmolejo-Campos*, however, our path is clear.

**[4]** Generally, "[w]e accord *Chevron* deference where there is 'binding agency precedent on-point (either in the form of a regulation or a published BIA case).' " *Renteria-Morales v. Mukasey*, 532 F.3d 949, 954 (9th Cir. 2008) (quoting *Kharana v. Gonzales*, 487 F.3d 1280, 1283 n.4 (9th Cir. 2007), *overruled on other grounds by Navarro-Lopez v. Gonzales*, 503 F.3d 1063 (9th Cir. 2007) (en banc)). *Chevron* deference to published BIA decisions is appropriate "as [the BIA] gives ambiguous statutory terms 'concrete meaning through a pro-

cess of case-by-case adjudication.' " *Aguirre-Aguirre*, 526 U.S. at 425 (quoting *INS v. Cardoza-Fonseca*, 480 U.S. 421, 448 (1987)).

**[5]** We review de novo the BIA's interpretation of a statute other than the INA, but whether an "offense constitutes a 'crime of moral turpitude' is governed by the same traditional principles of administrative deference we apply to the Board's interpretation of other ambiguous terms in the INA." *Marmolejo-Campos*, slip op. at 2637. In *Marmolejo-Campos*, we explained that "moral turpitude" is an "ambiguous phrase," *id.* at 2634, and noted previous decisions in which we deferred to the BIA's construction of "other ambiguous terms," including "particularly serious crime," *Miguel-Miguel v. Gonzales*, 500 F.3d 941, 947-48 (9th Cir. 2007), "conviction," *Murillo-Espinoza v. INS*, 261 F.3d 771, 774 (9th Cir. 2001), and "persecution," *Fisher v. INS*, 79 F.3d 955, 961 (9th Cir. 1996) (en banc). *Marmolejo-Campos*, slip op. at 2636. Because we defer to precedential BIA decisions that give meaning to ambiguous terms, we there held that the BIA's construction of "moral turpitude" though a process of case-by-case adjudication is entitled to *Chevron* deference. *Id.* at 2637.

**[6]** "Particular social group," like "moral turpitude," is an amorphous term. The BIA defined the general contours of the term in *In re Acosta* as "a group of persons all of whom share a common, immutable characteristic." 19 I. & N. Dec. 211, 233 (BIA 1985), *overruled on other grounds by In re Mogharrabi*, 19 I. & N. Dec. 439 (BIA 1987). The BIA has expanded on this definition by directing courts to further consider a group's "social visibility" and "particularity." *In re A-M-E-*, 24 I. & N. Dec. 69, 74 (BIA 2007). Nonetheless, the BIA must still determine in the first instance whether a specific group is a "particular social group" within the meaning of the INA. *Gonzales v. Thomas*, 547 U.S. 183, 185 (2006) (per curiam). "The matter requires determining the facts and deciding whether the facts as found fall within a statutory

term." *Id.* at 186. Because the BIA's determination that a certain group is or is not a "particular social group" is part of its effort to give an ambiguous statutory term concrete meaning, we hold that *Chevron* deference is due.[3]

**[7]** Our analysis is two-fold. First, we "ask[ ] whether 'the statute is silent or ambiguous with respect to the specific issue' before it." *Aguirre-Aguirre*, 526 U.S. at 424 (citing *Chevron*, 467 U.S. at 843)). If so, we ask " 'whether the agency's answer is based on a permissible construction of the statute.' " *Id.* (citing *Chevron*, 467 U.S. at 843). We will not overturn an agency decision at the second step "unless it is 'arbitrary, capricious, or manifestly contrary to the statute.' " *Fisher*, 79 F.3d at 961 (quoting *Romero v. INS*, 39 F.3d 977, 980 (9th Cir. 1994)); *see also Chevron*, 467 U.S. at 844.

**[8]** Because the INA does not define "particular social group," *Ochoa v. Gonzales*, 406 F.3d 1166, 1170 (9th Cir. 2005), we proceed to the second step. There we conclude that the BIA's determination that young Salvadoran men who have been recruited by gangs, but refuse to join, are not a "particular social group" is a reasonable interpretation of the INA.[4]

---

[3]In so holding, we join the Second and Eleventh Circuits. *See Ucelo-Gomez v. Mukasey*, 509 F.3d 70, 72 (2d Cir. 2007) (according *Chevron* deference to the BIA's determination in *In re A-M-E-* that "affluent Guatemalans" are not a particular social group); *Castillo-Arias v. U.S. Att'y Gen.*, 446 F.3d 1190, 1197 (11th Cir. 2006), (according *Chevron* deference to the BIA's determination in *In re C-A-*, 23 I. & N. Dec. 951 (BIA 2006) that "noncriminal informants who work against the Cali cartel" are not a particular social group), *cert. denied sub nom. Castillo-Arias v. Gonzales*, 127 S. Ct. 977 (2007).

[4]We first had occasion to consider the BIA's decision in *In re S-E-G-* in *Santos-Lemus v. Mukasey*, 542 F.3d 738 (9th Cir. 2008). We did not analyze the BIA's decision under the *Chevron* framework, noting instead that the BIA's decision was "not binding on us." *Id.* at 745. We decided *Santos-Lemus*, however, before our en banc decision in *Marmolejo-Campos*, in which we clarified the method by which we determine the degree of deference owed to BIA decisions. *Marmolejo-Campos*, slip op. at 2631-38. Thus, to the extent *Santos-Lemus* is inconsistent with *Marmolejo-Campos*, the later en banc decision must control.

**[9]** At the outset, we recognize that the relevant BIA opinion specifically addresses resistance to recruitment by the MS-13 in El Salvador, not Honduras. The BIA, however, expected its decision to apply to the same group in Honduras. *In re S-E-G-*, 24 I. & N. Dec. at 582 (noting that the Third Circuit, in *Valdiviezo-Galdamez v. Att'y Gen. of the U.S.*, 502 F.3d 285 (3d Cir. 2007), remanded a case "involving a Honduran applicant" so that the BIA could "consider[ ] [ ] the issue presented in the instant case").**⁵** We conclude that the BIA's decision is reasonable given that the same gang is at issue albeit in different countries.**⁶**

**[10]** We further note that the BIA held that "youth" who resist gang recruitment do not constitute a particular social group. The BIA, however, explicitly rejected a formulation of the social group that was further limited to young men. *Id.* at 585 ("The male respondents attempt to limit or define their proposed group by claiming that it is comprised of male children . . . who refuse recruitment."). Finding the BIA's decision on-point, we proceed.

**[11]** The BIA analyzed the purported social group using the factors set forth in *In re Acosta* and *In re A-M-E-*.**⁷** The BIA first found that members of the group shared common, immu-

---

**⁵**In a non-precedential decision the BIA recently applied *In re S-E-G-* to asserted persecution "on account of . . . membership in a particular social group, namely Honduran youth who have been actively recruited by gangs but have refused to join because they oppose the gangs." *In re Valdiviezo-Galdamez*, A097 447 286 (BIA Oct. 22, 2008) (unpublished) (rejecting the claim, as in *In re S-E-G-*).

**⁶**Ramos also attests that the MS-13 "operate[s] and [has] a stronghold throughout North America and most of Central America," including Mexico, Guatemala, Honduras, and El Salvador, and "operates transnationally."

**⁷**We previously affirmed and adopted the BIA's interpretations in these decisions in *Hernandez-Montiel v. INS*, 225 F.3d 1084, 1093 (9th Cir. 2000) (*In re Acosta*) and *Arteaga v. Mukasey*, 511 F.3d 940, 944-45 (9th Cir. 2007) (*In re A-M-E-*).

table characteristics. *In re S-E-G-*, 24 I. & N. Dec. at 584. While youth is a transient state, the BIA acknowledged "that the mutability of age is not within one's control." *Id.* at 583-84. The BIA also noted that prior gang recruitment is "a shared past experience, which, by definition, cannot be changed." *Id.* at 584. Nonetheless, the BIA explained, "shared past experience [does not necessarily] suffice [ ] to define a particular social group for asylum purposes." *Id.*

**[12]** After analyzing the social group under the rubrics of particularity and social visibility, the BIA determined that Salvadoran youth who resist recruitment by the MS-13 are not a particular social group. *Id.* at 588. Further defining the "particularity" requirement, the BIA explained that "[t]he essence of the 'particularity' requirement [ ] is whether the proposed group can accurately be described in a manner sufficiently distinct that the group would be recognized, in the society in question, as a discrete class of persons." *Id.* at 584. Salvadoran youth who were recruited by the MS-13 but resisted membership failed the particularity requirement because "[t]hey make up a potentially large and diffuse segment of society," and, for that social group further limited by gender, "the motivation of gang members in recruiting and targeting young males could arise from motivations quite apart from any perception that the males in question were members of a class." *Id.* at 585. In sum, the BIA concluded that the social group, even with a gender delimitation, "[is] too broad to qualify because '[t]here is no unifying relationship or characteristic to narrow this diverse and disconnected group.' " *Id.* at 586 (second alteration in original) (quoting *Ochoa v. Gonzales*, 406 F.3d 1166, 1171 (9th Cir. 2005)).

**[13]** The BIA further rejected the social group claim because the group lacked the requisite social visibility. " '[T]he attributes of a particular social group must be recognizable and discrete.' " *Id.* (quoting *In re C-A-*, 23 I. & N. Dec. at 956); *see also Arteaga*, 511 F.3d at 945 ("[A] shared characteristic of a group must generally be recognizable to

others.") (citing *In re A-M-E-*, 24 I. & N. Dec. at 74). The BIA reasoned that "gang violence and crime in El Salvador appear to be widespread, and the risk of harm is not limited to young males who have resisted recruitment . . . but affects all segments of the population." *In re S-E-G-*, 24 I. & N. Dec. at 587.[8] Thus, the BIA concluded that those who have resisted recruitment are "not in a substantially different situation from anyone who has crossed the gang, or who is perceived to be a threat to the gang's interests." *Id.* While conceding that young men are targeted, the BIA concluded that such targeting is not on the basis of belonging to the class of "men," but rather "to fill [the gang's] ranks." *Id.* at 588.

**[14]** We conclude that the BIA's decision is not arbitrary and capricious. Indeed, we relied on the BIA's decision when we recently concluded that "young men in El Salvador resisting gang violence" did not constitute a particular social group. *Santos-Lemus*, 542 F.3d at 745-46. The BIA's decision also comports with our holdings in *Sanchez-Trujillo v. INS*, 801 F.2d 1571 (9th Cir. 1986), and *Ochoa*.

In *Sanchez-Trujillo*, we upheld that BIA's determination that "young, urban, working class males" did not constitute a particular social group. 801 F.2d at 1575-77. In *Ochoa*, we similarly affirmed the BIA's rejection of a social group purported to consist of "business owners in Colombia who rejected demands by narco-traffickers to participate in illegal activity." 406 F.3d at 1170-71. In both cases, we concluded that the groups were not sufficiently particular given that individuals within this group " 'manifest[ed] a plethora of different lifestyles, varying interests, diverse cultures, and contrary political leanings.' " *Id.* at 1171 (quoting *Sanchez-Trujillo*,

---

[8]After explicitly referring to El Salvador, the BIA further noted that "MS-13 gang members in Central America have resorted to random violence against the general population as a means to protest against the crackdown on gang activities in the country." *Id.* (internal citation omitted).

801 F.2d at 1577). We relied on both cases when concluding that "young men in El Salvador resisting gang violence" do not constitute a social group because it was "too broad and diverse." *Santos-Lemus*, 542 F.3d at 745-46.

[15] The group consisting of young Honduran men who have been recruited by the MS-13, but who refuse to join, is similarly broad and diverse. Only shared experience — that of gang recruitment — unites them. The gangs target a wide swath of society, and we have no evidence before us that they target young men with any particular political orientation, interests, lifestyle, or any other identifying factors. Thus, it was reasonable for the BIA to conclude that the group was not sufficiently particular.

[16] The BIA also reasonably concluded that the group lacked social visibility. The threats and harassment Ramos and other young men experience after being recruited is a sad part of the "general criminality and civil unrest" perpetrated and perpetuated by the MS-13 in Central America. *Id.* at 746. There is no evidence in the record that young men who have been recruited by the MS-13 in Honduras are generally visible to society. In fact, Ramos-Lopez attests to indiscriminate action taken by the police against children who are not in gangs in their efforts to curb gang activity. This fact evinces a lack of social visibility. While MS-13 members may be able to identify those who have resisted recruitment, it is not because the group, as a group, is visible; rather, MS-13 members appear to keep tabs on individuals who have refused to join.

[17] We conclude that the BIA reasonably interpreted the INA by refusing to recognize young Salvadoran men who have been recruited by gangs and refuse to join as a particular social group. Deferring to the BIA's interpretation, we hold that young Honduran men who have been recruited by gangs but refuse to join do not constitute a particular social group.

## B. Political Opinion

**[18]** Ramos also contends that he was persecuted and has a well-founded fear of persecution on account of his political opinion. We defer to the BIA's reasonable interpretation of "political opinion" for the same reason we defer to the BIA's reasonable interpretation of "particular social group." The INA does not define "political opinion." Instead, the BIA gives shape to the amorphous term through a process of case-by-case adjudication.

In *Santos-Lemus*, we deferred to the BIA's determination that "resistance to a gang's recruitment efforts alone [does not] constitute[ ] political opinion." 542 F.3d at 747 (citing *In re S-E-G-*, 24 I. & N. Dec. at 588 (relying on *INS v. Elias-Zacarias*, 502 U.S. 478 (1992)); *see also In re E-A-G-*, 24 I. & N. Dec. 591, 596 (BIA 2008) ("[The] refusal to join MS, without more, does not constitute a 'political opinion.' "). Because the petitioner in *Santos-Lemus* presented no "evidence of an actual political opinion or motive in [the petitioner's] or the gang's actions," he could not prove persecution on account of political opinion. 542 F.3d at 747.

**[19]** Ramos' case is indistinguishable. He alleges no facts in support of a political opinion, actual or imputed, beyond his refusal to join the MS-13. Thus, the IJ's determination that Ramos did not prove persecution on account of a protected ground is supported by substantial evidence.

## IV.

Because Ramos did not prove that he suffered or has a well-founded fear of persecution by the MS-13 on account of one of the five protected grounds, we uphold the BIA's decision denying asylum and withholding of removal.

**PETITION FOR REVIEW DENIED.**